427 So.2d 1227 (1983)
Jan TRICHEL, Plaintiff-Appellant,
v.
Dr. Michael CAIRE, et al, Defendants-Appellees.
No. 15072-CA.
Court of Appeal of Louisiana, Second Circuit.
February 22, 1983.
Rehearing Denied April 7, 1983.
*1229 Chris J. Roy, Alexandria, for plaintiff-appellant.
Hayes, Harkey, Smith & Cascio by Thomas M. Hayes, III, Monroe, for defendants-appellees.
Before PRICE, HALL and SEXTON, JJ.
PRICE, Judge.
This is a medical malpractice action against plaintiff's treating physician and one of his partners, their medical partnership, Glenwood Hospital and the medical malpractice insurer. Plaintiff appeals the trial court judgment dismissing her claim, raising the following substantial issues: (1) is the doctrine of res ipsa loquitur applicable to this set of facts? (2) if res ipsa loquitur is not applicable, did plaintiff prove actionable negligence on the part of Dr. Donald, Dr. Caire and/or Glenwood Hospital? (3) if res ipsa loquitur is applicable, did the defendants show an absence of negligence sufficient to negate liability? and (4) what amount of damages will adequately compensate plaintiff for her injuries if defendants are liable therefor?

FACTS
Plaintiff, Mrs. Trichel, entered Glenwood Hospital on July 21, 1978, for delivery of her second child. Her attending physician was Dr. Donald, the general practitioner who had provided her prenatal care. He is a member of the defendant medical partnership, Donald, Caire & Watson, which also includes defendant Caire, an obstetrician-gynecologist (Ob-Gyn). The other partner, Dr. Watson, is a general practitioner and is not an individual defendant herein.
The baby was delivered without incident and Dr. Donald left the hospital a short time later. Then, approximately an hour later, Mrs. Trichel began hemorrhaging severely due to an everted uterus, i.e., one which is turned inside out. Dr. Watson and Dr. Truly, an Ob-Gyn, both of whom happened to be at the hospital at the time, responded to the emergency and attempted unsuccessfully to revert the uterus by manually pushing it back to its original position. Dr. Donald was recalled to the hospital and performed an emergency postpartal hysterectomy with the consent of plaintiff's husband. A day or two later, he went out of town on vacation, leaving Mrs. Trichel in the care of his partner, Dr. Caire. Seven days after the surgery, Dr. Caire ordered the stitches removed, which was three days sooner than Dr. Donald had instructed before leaving. On the day of her anticipated discharge, the wound from the surgery reopened through the several layers of skin and tissue. Plaintiff was rushed to surgery and Dr. Caire performed a second closure. Three days later she was discharged from the hospital.
Although she had undergone a total hysterectomy, i.e., complete removal of the uterus, Mrs. Trichel continued to have light monthly bleeding and it was discovered that part of her cervix, which is the neck of the uterus, and some endometrial cells of the uterus had not been removed. She subsequently developed cervicitis (infection of the cervix) and underwent surgery for removal *1230 of the remainder of the cervix in October, 1981.
Plaintiff brought suit alleging that Dr. Donald was negligent in failing to anticipate poor wound healing, in attempting to perform a surgical procedure beyond his capability, in failing to complete the procedure by removing the cervix, and in removing her Fallopian tubes and an ovary without her consent. She further alleged that Dr. Caire was negligent in premature removal of sutures and Glenwood Hospital was negligent in allowing Dr. Donald to perform surgery beyond his capability and in failing to keep adequate records of her condition.
After trial on the merits, the jury found both Dr. Donald and Dr. Caire were not negligent in their treatment of plaintiff. They also found Glenwood negligent, but its negligence was not a cause of Mrs. Trichel's damage.
In addition to the issues outlined at the beginning of this opinion, plaintiff cites various assignments of error in the conduct of the trial by the lower court and in the charges given to the jury. We pretermit a discussion of these assignments and address only the substantial issues summarized above inasmuch as our review of the record reveals that the judgment rendered is correct.

RES IPSA LOQUITUR
The initial inquiry is whether the trial judge should have instructed the jury to apply the doctrine of res ipsa loquitur. The resolution of this issue determined the burden of proof to be borne by each party.
The plaintiff's burden of proof in a malpractice action is set forth in LSA-R.S. 9:2794, which provides in pertinent part:
"A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq, or a dentist licensed under R.S. 37:751 et seq, the plaintiff shall have the burden or proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty,
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
B. * * *
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving by a preponderance of the evidence, the negligence of the physician or dentist. The jury shall be further instructed that injury alone does not raise a presumption of the physician's or dentist's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable." (emphasis added).
The application of res ipsa loquitur in malpractice cases was explained by this court in the recent case of Rogers v. Brown, 416 So.2d 624 (La.App. 2d Cir.1982):
"The doctrine of res ipsa loquitur becomes applicable when the circumstances surrounding the incident in question ... are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the injury was due to the negligence of the person ... having control of the thing involved in the injury. In essence, this inference of negligence may be drawn because all of the circumstances surrounding the injury are of such a character *1231 that, unless an explanation can be given, the only fair and reasonable conclusion is that the injury was due to some breach of the defendant's (physician's) duty. See Larkin v. State Farm Mutual Automobile Ins. Co., 233 La. 544, 97 So.2d 389 (1957); White v. McCool, 395 So.2d 774 (La.1981).
In reality, the doctrine of res ipsa loquitur is simply another formulation of plaintiff's burden in a tort action to prove that, more probably than not, his injury was caused by defendant's negligence. However, before charging the jury on the propriety of drawing this inference of negligence from the circumstances, it is the function of the trial judge in a medical malpractice case to decide the applicability of the doctrine by addressing these threshold questions: (1) Did the injury occur while plaintiff's body was in the exclusive custody of the defendant physician and (2) was the injury one that does not ordinarily occur in the absence of negligence...?" Id. at 628.
It is obvious that plaintiff's injuries were incurred while her body was in the exclusive custody of the defendant. Therefore, the trial court must have concluded that the injuries were not such as do not ordinarily occur in the absence of negligence. We find this conclusion amply supported by the record.
The evisceration of Mrs. Trichel's incision was the direct result of poor wound healing. Considerable expert testimony was heard from four Ob-Gyn specialists  Dr. Blanchard Texada, Dr. Richard Vines, Dr. Robert Jarrell and Dr. James Truly  in addition to that of the defendant, Dr. Caire. There was further testimony from Dr. George Sartor, a general surgeon. It was generally agreed that wound dehiscence depends on the healing quality of the patient, not the type of suture used by the surgeon. It was also agreed that the healing quality of the patient may be affected by several different factors. Among those mentioned were prior incision, debilitation of the patient by chronic illness, long-term administration of steroids, old age, nutritional deficiency, obesity, infection, and hematoma (accumulation of blood in the wound).
The only testimony with respect to a specific cause for Mrs. Trichel's wound evisceration was given by Dr. Texada, who opined that it resulted from a hematoma. His opinion was based on Mrs. Trichel's deposition testimony that she saw blood on her hospital gown.[1] However, he also stated that, while the incidence of such events is less than one in one thousand, a wound dehiscence can happen to anybody. Thus, it is evident that, although this is an unusual occurrence, it can and does occur without negligence.
The evidence with regard to the failure of Dr. Donald to completely remove the cervix in the emergency hysterectomy showed that it is difficult, at best, to detect whether the entire uterus, fundus (body) and cervix (neck), has been successfully removed in a postpartal hysterectomy. The cervix is normally much smaller and thicker than the body of the uterus, but becomes stretched and very thin during the vaginal delivery of a baby. Therefore, it is difficult to distinguish from the fundus and the vagina. Removal of the cervix is further complicated by the fact that it is not visible during abdominal surgery. It was testified that a postpartal hysterectomy is not a common operation, and is more difficult than an elective hysterectomy because of the abnormal size of the female organs, especially after a vaginal delivery. Three of the Ob-Gyn specialists who testified stated that they had also failed to completely remove the cervix under similar circumstances. We do not imply that such a failure may not be negligent in some cases. We simply hold that in the instant case it does not warrant an inference of negligence. For these reasons, we hold that the doctrine of res ipsa loquitur is inapplicable here. Thus, the plaintiff's burden of proof here is governed by LSA-R.S. 9:2794(A), quoted above.

*1232 PERFORMANCE OF SURGERY
Mrs. Trichel first maintains that Dr. Donald's performance of the surgery himself was substandard conduct because he was not an Ob-Gyn specialist. Dr. Texada testified that he felt Dr. Donald should have asked Dr. Truly to perform the operation since he was the only board certified Ob-Gyn specialist present at the time. However, it was shown that, while Dr. Donald is not a specialist in this field, he has spent the greater percentage of his time practicing obstetrics and gynecology since beginning the private practice of medicine in Monroe in 1962. He testified that he performed an average of thirteen to fourteen hysterectomies a year and three or four of these were postpartal emergencies. The physicians who had worked with him before testified that he was considered competent in this field.
While Dr. Donald was not board certified as an Ob-Gyn specialist, the preponderance of the evidence in the record shows he possessed the necessary skill and experience to be competent to perform this emergency surgical procedure in the care of his patient.

FAILURE TO REMOVE CERVIX
With respect to the claim of negligence in failing to completely remove the cervix, plaintiff's expert, Dr. Texada, did testify he felt he could have detected the cervix although he conceded that it would be difficult. The other specialists, including plaintiff's witness Dr. Vines, stated it was very difficult to detect in such instances and that they themselves had failed in some cases to successfully complete removal. In the instant case, Mrs. Trichel's female organs were significantly larger than normal. In fact, because of the uterine eversion through the cervix, they were even larger than is usual in most postpartal hysterectomies, and thus virtually undistinguishable from the vagina by feel, which is the only way to identify it in abdominal surgery of this nature.
Furthermore, Dr. Donald testified that he believed he had removed all of the cervix and did not want to prolong the surgery any longer at that point because of plaintiff's substantial loss of blood.
The plaintiff must show the degree of care ordinarily practiced by the Ob-Gyn specialists and that Dr. Donald either lacked the degree of knowledge and skill required or failed to use reasonable care and diligence in applying the knowledge and skill in her treatment. See LSA-R.S. 9:2794, supra, and Ardoin v. Hartford Accident & Indemnity Co., 360 So.2d 1331 (La. 1978). The evidence in the record does not bear out her claim that Dr. Donald failed to possess the required skill or to use reasonable care in applying it.

WOUND EVISCERATION
Plaintiff-appellant further contends that Dr. Donald breached his physician's duty by not anticipating that she would be a poor healer and thereby caused her wound evisceration. She argues he should have used interrupted sutures to close the peritoneal and fascial layers of her abdomen, put drains in the wound, and used large retention sutures around the incision to hold it together. Dr. Texada is the only witness who testified he would have used these measures because of the possibility of infection, her substantial loss of blood, and obesity. The other doctors testified they would not have expected poor healing, did not consider her overweight condition extreme enough to require retention sutures (which involve some discomfort), and would not have used drains because there was no active infection at the time of the surgery and the wound was not bleeding at the time of closure. Nor was there any infection when the wound reopened. None of the other factors which would lead one to expect poor wound healing were present.
Additionally, it was generally agreed by all except Dr. Texada that there is no particular advantage in using interrupted sutures over running sutures. Her incision would have failed to heal anyway.
It was not established that there was any discernible reason for plaintiff's failure to heal and there was no significant proof of a *1233 particular cause, such as hematoma or infection. The outer stitches were removed seven days after the surgery, which was shown to be an average length of time to allow the skin to heal (testimony indicated four to five days is the usual length of time). It was agreed, even by Dr. Texada, that Dr. Caire's removal of the stitches was not premature. Therefore, no negligence has been shown on the part of either Dr. Donald or Dr. Caire in connection with the wound evisceration.

FALLOPIAN TUBES AND OVARY
As for the claim with respect to the alleged removal of the Fallopian tubes and ovary(ies), the record shows that Dr. Donald did remove the Fallopian tubes. There was testimony to the effect that, in some cases, removal of the tubes without removing the ovaries may have an adverse effect on the blood supply to the ovaries. Dr. Donald testified he removed the tubes because he had been taught that removal of the uterus was facilitated by their prior removal and, without the uterus, they served no purpose. There was no evidence that plaintiff's ovaries had been affected by the removal.
The only evidence to show that either ovary had been removed was plaintiff's statement to Dr. Vines that Dr. Donald had removed an ovary. The report on Dr. Donald's hysterectomy made no mention of such a procedure and neither Dr. Donald nor Dr. Watson, who assisted in the surgery, was questioned on this subject at trial.
Dr. Vines, Mrs. Trichel's present gynecologist, testified she still has at least one of her ovaries. He stated he saw one of her ovaries while performing a vaginal cervicectomy, but both are not always visible vaginally. The only way to tell if she has both is by laparoscopic examination in which one views the pelvic area through a small tube, or perhaps by an ultrasound procedure in which it might or might not be detected. In addition to plaintiff's failure to prove the facts of this claim, she also failed to show any damage in terms of hormonal imbalance since she still has at least one ovary. Therefore, this claim was properly denied.

CLAIM AGAINST GLENWOOD HOSPITAL
Mrs. Trichel complains that Glenwood Hospital is also liable for her injuries because it improperly granted Dr. Donald privileges to perform the instant surgical procedure when he was not qualified to do so, and because they kept incomplete records of her condition. Inasmuch as we find no negligence on the part of Dr. Donald, the hospital's granting of such privileges to Dr. Donald did not cause her complications. The same holds true in the case of the record-keeping. While the charts with respect to vital signs were obviously incomplete and poorly kept when measured against hospital regulations, their deficiency played no part in causing the problems suffered by Mrs. Trichel. For these reasons, the hospital bears no liability to her.
For the reasons assigned, the judgment appealed is AFFIRMED. All costs of this appeal are assessed against plaintiff-appellant.
AFFIRMED.
NOTES
[1] He was under the impression that plaintiff had stated there was a gush of blood, but it was demonstrated at trial that she actually said, "... I looked down and there was a spot of blood on my gown..."