488 So.2d 1169 (1986)
Henry L. BUTTS, et al., Plaintiffs-Appellants,
v.
Dr. Anna CUMMINGS, et al., Defendants-Appellees.
No. 17830-CA.
Court of Appeal of Louisiana, Second Circuit.
May 7, 1986.
Rehearing Denied June 5, 1986.
*1170 Carola Milkovich, Troy Bain, Shreveport, for plaintiffs-appellants.
Mayer, Smith & Roberts by Alex F. Smith, Jr., Shreveport, for defendants-appellees.
Before MARVIN, SEXTON, and NORRIS, JJ.
MARVIN, Judge.
In this medical malpractice action tried by a jury, plaintiffs Mr. and Mrs. Butts appeal a judgment rejecting demands made on behalf of their 11-year-old quadraplegic daughter, Debra, against Dr. Anna Cummings, her partners, and her insurer for brain damage Debra suffered during post-natal care at Schumpert Medical Center in 1974. The jury was presented conflicting medical opinion testimony. We review the facts and the opinions and affirm.

THE ISSUES
Schumpert and its insurer were named as defendants but were later dismissed from the action. Debra was born on Wednesday, December 11, 1974. Sometime during the following weekend, she developed an illness or condition that raised the level of unconjugated bilirubin in her bloodstream to dangerous levels. Debra's condition was discovered about 4:45 a.m. the following Monday, December 16, when nurses first noted that she was "severely jaundiced" and "lethargic." The nurses did not inform Dr. Cummings of Debra's condition until she arrived at the hospital *1171 for routine rounds at 7:45 a.m. The issue is whether the jury was clearly wrong in its findings that the course of treatment instituted both following birth and particularly at 7:45 a.m. on that Monday by Dr. Cummings conformed with the degree of knowledge, care and skill ordinarily practiced by other pediatricians within that medical specialty in 1974. LRS 9:2794(A)1.
By special verdict, a jury found "from a preponderance of the evidence that [Dr. Cummings] was [not] negligent [in any way that] was a proximate cause of Debra Butts' injury." Appellants claim that these findings were manifestly erroneous or clearly wrong.
Dr. Cummings' actions were based on her informed professional judgment which, despite appellants' evidence to the contrary, the jury found either or both was not substandard and did not substantially contribute to Debra Butts' injury. Given the sharply conflicting medical testimony of eminently qualified experts, there was ample evidence before the triers of fact, which, if believed by the jury, forms a reasonable basis for its findings. Lauro v. Travelers Insurance Company, 261 So.2d 261 (La.App.4th Cir.1972); Sepulvado v. Willis-Knighton Medical Center, 459 So.2d 152 (La.App.2d Cir.1984); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Appellants also complain that remarks made by defense counsel improperly referred to the compromise settlement of their demands against Schumpert and influenced the verdict. We do not agree, finding that the remarks were not necessarily so construed by the jury and did not contribute to or unduly influence the verdict.

INFANT JAUNDICE: CAUSES, SYMPTOMS, AND TREATMENT
Jaundice was described as a condition caused by a buildup of bilirubin, a waste product of red blood cells. Unconjugated bilirubin is harmful to the brain and other tissues until it is broken down by the liver and other organs into conjugated bilirubin which the body may excrete with other wastes.
A large percentage of newborn babies (estimates ranged from 50 percent to 80 percent) encounter some degree of jaundice because the liver, gallbladder, and other organs that facilitate excretion of blood waste do not always fully function in a newborn infant. When the level of serum bilirubin exceeds 20 milligrams, the infant may be suffering from a condition called hyperbilirubinemia, which, if not checked, may cause damage to the nervous system including brain damage which is called kernicterus. The degree of risk and magnitude of brain damage is directly related to the level and duration of excess bilirubin.
As bilirubin accumulates in organs and tissues, the skin of the body and the sclera of the eyes turn yellow. When jaundice becomes severe and kernicterus begins to occur, the infant becomes lethargic and feeds poorly. Advanced kernicterus is evidenced by an arching of the back and neck, called opisthotonos.
Some discoloration is visible even in mild cases of infant jaundice. One nurse, however, testified that early or mild jaundice is more difficult to visually detect in black babies than in white babies. She explained that discoloration of the sclera of the eyes is often the earliest visible sign.
The recognized treatment for severe cases of hyperbilirubinemia is an exchange transfusion whereby the infant's bilirubin-rich blood is removed and replaced with fresh blood in 10 cc increments until the entire volume of blood in the infant's body has been replaced. This process must be repeated if the first exchange does not reduce the bilirubin to a safe level.

MEDICAL HISTORY OF DEBRA BUTTS
The Schumpert maternity ward has a main nursery for healthy babies and a separate one for those requiring special or intensive care. In 1974, the main nursery was staffed with nurse's aides and LPNs who performed routine infant care tasks *1172 and generally observed the infants for signs of illness. Each infant was weighed once and was fed twice during an eight-hour shift. The special care nursery was staffed with at least one RN at all times. Another RN, who is not present at all times, served as head nurse in charge of the nurseries.
Debra weighed 5 pounds, 11 ounces at birth and was in the care of Dr. Cummings, a staff pediatrician. Dr. Cummings believed Debra was "slightly premature" but was otherwise healthy.
The infant was breast-fed during the next 48 hours. The mother said that on Friday she noticed that Debra was sluggish, felt "cool," and was not feeding well. On Saturday morning, Dr. Cummings examined Debra, finding that her weight dropped about 10 ounces and that her temperature was a subnormal 94.8 degrees.
Mother and child were to be discharged that Saturday, but Dr. Cummings directed that Debra remain for observation. Dr. Cummings entered written orders on Debra's chart, directed at nurse Small, the LPN duty nurse, for Debra to be placed in an incubator in the main nursery and to be given supplemental feedings of a special formula. Debra's mother was discharged on Sunday.
Dr. Cummings then left Shreveport for a weekend trip. She instructed her partner, Dr. Mack, to "cover" for her until noon Sunday, when Dr. Kelly, another Shreveport pediatrician not associated with Dr. Cummings, also by agreement, was to take charge of Dr. Cummings' patients until Monday morning.
Dr. Mack made rounds for Dr. Cummings on Sunday morning and ordered no changes in Debra's care. Nurse Small, again on duty during the 7 to 3 shift in the main nursery, wrote in her notes, "Dr. Don Mack ckd, good 8 hrs." Nurse Small's notes also show that Debra began to gain weight and that her temperature rose to 97 degrees.
Debra was examined or checked only by an LPN and not by an RN or a physician during the next 12 to 18 hours. During the 11 p.m. to 7 a.m. "graveyard" shift ending Monday morning, LPN Nurse Black was on duty in the main nursery. Her notes show that Debra's temperature had stabilized at 97 to 98 degrees during the night.
Nurse Paxton, the sole RN in the nursery during the graveyard shift, was responsible for the special care nursery as well as the entire nursery with the head nurse absent. Nurse Paxton said that at about 4:30 Monday morning, she passed the main nursery window and observed Debra wrapped in a blanket inside the incubator. She said Nurse Black indicated that Debra had "fed well" at her 2:00 a.m. feeding and appeared well. Nurse Paxton, however, returned to the main nursery a few minutes later, she said, because she "sensed" something was wrong with Debra. She removed Debra from the incubator and placed her on a lighted examination table, where she observed that Debra's skin was greenish and her eyes yellowish in color. Suspecting severe jaundice, Nurse Paxton caused a lab technician to obtain blood for a bilirubin test.
Believing it certain that Debra would be transferred to special care, she returned Debra to the incubator and set up ultraviolet "bili lights" in the special care nursery ordinarily used to treat babies with routine, or mild jaundice. A note entered at 5:30 a.m. stated "baby jaundiced, lethargic, not [feeding] as well as had earlier, urine concentrated, bilirubin collected per lab."
Dr. Kelly, still on call for Dr. Cummings, arrived for early rounds at 5:50 a.m. and noted on Debra's chart "baby jaundiced & listless ... tests ordered." He also directed that Debra be moved to the special care nursery, be given a battery of tests and medications for a suspected blood infection, and that Dr. Cummings be called. Notes indicate that Nurse Paxton began carrying out these orders at 6:00 a.m., but she said she did not call Dr. Cummings because she did not complete the tests ordered by Dr. Kelly until about 6:45 or 7:00 and she expected that Dr. Cummings would be in soon thereafter. Nurse Paxton finished *1173 her shift at 7:00 and left the hospital. Debra's bilirubin test results were not yet available.
Dr. Cummings arrived at 7:45 a.m., without any knowledge or information of Debra's worsened condition. The bilirubin results were completed and indicated that Debra's unconjugated bilirubin level was 33.09 when her blood was drawn some two hours earlier. Dr. Cummings immediately ordered nurses and technicians to cross match Debra's blood in preparation for an exchange transfusion. Debra's parents were called for cross matching of blood. When they arrived about 8:15, Dr. Cummings informed Mr. and Mrs. Butts of Debra's condition. She then finished her rounds and went back to her office.
When notified that preparations for the exchange were complete, Dr. Cummings returned to the hospital. She commenced a 475 cc blood exchange at 10:55 a.m. which was completed at 11:55 a.m. During the course of the exchange, which expert witnesses characterized as very "stressful" to the infant, Debra experienced apnea, or cessation of breathing.
About noon, Dr. Cummings ordered other tests, including a spinal tap. She said she believed Debra's elevated bilirubin was initially caused by meningitis or a blood infection (sepsis). She then returned to her office to await notification of the results of the latest tests.
Nurses' notes entered between noon and 3:30 p.m. state "infant pulls head backward," "lethargic, arching back," and "yellow mucus stool & trace of blood." Appellants contended these were signs of kernicterus and opisthotonos and that Debra's brain damage was advancing throughout the day.
A second bilirubin test was ordered at about 3:00 p.m. This test showed that Debra's unconjugated bilirubin level was still high (23.03). Other tests, including blood gas, sodium, and potassium, showed normal levels. Dr. Cummings then ordered cross matching for a second exchange transfusion, which was commenced at 5:45 p.m. and completed at 7:00 p.m. Dr. Cummings' notes indicate Debra "tolerated this exchange better" than the first exchange but that Debra's condition was still "very critical."
Debra's jaundice gradually subsided over the next few days. She was discharged December 30. She is now confined to a wheelchair and is unable to care for herself or to perform basic bodily functions without assistance. Dr. Cummings' discharge diagnosis was "probable sepsis hyperbilirubinemia."
The Butts family now lives in Daytona Beach, Florida, where Debra is given daily physical and mental therapy. Debra will be placed in a school for additional training when she reaches age 18. Her therapists testified that her mental capacity is not likely to exceed kindergarten level.

LIABILITY
Appellants' theories of liability focus on the adequacy of instructions which Dr. Cummings gave nurses when she left for the weekend and the course of treatment which she prescribed upon learning of Debra's condition Monday morning. Appellants essentially contend that Dr. Cummings unjustifiably used a "normal" rather than an "emergency" procedure to lower Debra's bilirubin, negligently exposed her to this dangerous condition for several more hours, and caused additional brain damage and disability to Debra.
A. THE STANDARD OF CARE AND OUR STANDARD OF REVIEW
This appeal raises issues peculiar to the pediatric specialty and the care of newborn infants. A subspecialty devoted exclusively to the care of newborns, neonatology, has recently evolved, but in 1974 pediatricians routinely cared for newborn infants. Our review is in the light of the standard of care practiced in 1974.
Appellants bear the burden of proving the standard by a preponderance of the evidence, that Dr. Cummings either lacked this degree of knowledge or skill or failed to use reasonable care and her best judgment *1174 in the application of that standard, and that this lacking or failure caused the harm encountered by Debra. LRS 9:2794; Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978); Steinbach v. Barfield, 428 So.2d 915 (La.App.1st Cir. 1983); Trichel v. Caire, 427 So.2d 1227 (La.App.2d Cir.1983). The statutory standard of care was not in effect in 1974 but has been declared to be retroactive. Ardoin, supra.
These standards of knowledge, skill, and care are best determined from expert witnesses who are members of the pediatric specialty and qualified to testify on the subject of post-natal care. Lauro, supra; Steinbach, supra. A reviewing court will give great deference to a jury's findings when medical experts express different views, judgments, and opinions on whether the standard of care was met in any given case. It has been stated that
... the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
... When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Canter v. Koehring Company, 283 So.2d 716 at 724 (La.1973).
B. DR. CUMMINGS' TREATMENT OF DEBRA.
Appellants contend that the jury manifestly erred in not finding Dr. Cummings' treatment of Debra was substandard in three specific respects.
1. Early treatment and instructions to nurses.
Appellants contend that Dr. Cummings should have recognized Debra's low temperature and weight loss as signs of "possible" jaundice when she made her rounds on Saturday morning before she left for the weekend. Appellants assert Dr. Cummings left no special instructions for nurses to periodically examine Debra for jaundice and did not state why Debra was being kept in the hospital for observation. Appellants complain that Dr. Cummings should have ordered Debra placed in the special care nursery under closer, more detailed observation by a registered nurse. The failure of nurses in the main nursery to recognize Debra's jaundice, appellants contend, should not absolve Dr. Cummings of her duty to inform hospital personnel of her concerns and to instruct them regarding Debra's care.
Because small infants may experience hypothermia and weight loss from dehydration and inability to properly breast feed in the first few days after birth, Dr. Cummings ordered supplemental feedings and incubator treatment for Debra.
Appellants' expert, Dr. Garrison, said that the presence of these symptoms on Saturday morning should have alerted Dr. Cummings to a possible jaundice problem. The jury could have found, however, on evidence that over half of all infants experience some degree of jaundice, that Debra's Saturday symptoms did not indicate she would develop a dangerous bilirubin concentration. The jury could have also understood Dr. Garrison's testimony to mean that dehydration and hypothermia are not necessarily causes or symptoms of jaundice, but serve merely to increase the body's vulnerability to the illness that develops from other causes. The record indicates that Debra's condition in fact improved before it later worsened on Sunday night or Monday morning.
In addition, there was evidence that nurses in the main nursery where Debra was placed were supposed to observe an infant's color, make notes about general observations, and report cases of "mild jaundice" to the RN on duty. Although LPNs and nurse's aides were not allowed to write *1175 on a patient's chart, they were required to keep records which contain spaces for infant weight, feeding times, and comments. Although Dr. Cummings had a duty to inform nurses of suspected difficulties, she is entitled to rely on hospital personnel to report problems that develop later, especially in light of the frequency of infant jaundice.
On the basis of this record, a jury finding that a prudent pediatrician could not have anticipated Debra's illness from her condition on Saturday morning is not clearly wrong.

2. Delay in Administering the First Exchange Transfusion.

Debra admittedly was in very critical condition on Monday morning and her excessive bilirubin level presented a potentially life-threatening situation. The experts sharply differed, however, on whether an immediate, universal blood exchange transfusion, although clearly desirable and necessary to reduce her bilirubin and to avoid further brain damage, would place her life in immediate jeopardy because of a possible reaction to incompatible blood.
We agree that Debra must have sustained some brain damage during the three-hour delay from the time Dr. Cummings arrived until the first exchange was administered. Debra's bilirubin was critically excessive five hours before the exchange when Debra's blood sample was taken to test for bilirubin. The record supports the implicit finding of the verdict that Dr. Cummings' course of treatment was not substandard.
The record supports the conclusion that pediatricians consider infants with less than 12 milligrams of bilirubin to be "mildly" jaundiced and to require ultraviolet "bili light" or treatment by other external means. A bilirubin in excess of 12 milligrams is considered potentially dangerous and may require an exchange transfusion. Dr. Garrison testified, on the one hand, that the cross matching procedure used by Dr. Cummings is acceptable only when the bilirubin is between 12 and 20 milligrams and that once it is found to exceed 20 milligrams, the infant is in immediate danger of serious, permanent harm and requires prompt emergency procedures. Dr. Garrison said that the accepted practice in cases of bilirubin in excess of 20 milligrams was to immediately perform exchange transfusions with whatever blood was available and to continue the exchange transfusions until the bilirubin is reduced to a safe level.
Recognizing that cross matching can take as long as three hours in a typical hospital setting, Dr. Garrison said that Debra was so critically ill that Dr. Cummings should have bypassed the cross matching procedure and began an exchange transfusion with any universal O-type blood that was on hand. He said that the risk of a reaction or infection from incompatible blood was outweighed by the risk of additional brain damage that would occur during a delay.
Dr. Cummings and three other doctors, Gustafason, Webb, and Cotter, on the other hand, categorically stated that a universal transfusion under these circumstances was totally unacceptable. Dr. Cotter said that Dr. Cummings would have been severely criticized had she not cross matched blood for the exchange. He also said that universal exchanges should be performed on infants only in two instances: when the infant has suffered massive blood loss and when the infant is born with a blood and fluid disorder called fetal hydrops, which is caused by antibodies present in the RH negative blood of the mother. In the latter case, doctors may be able to determine before birth that an exchange will be necessary and prepare blood accordingly. In both instances, it was explained that the infant will "die in a matter of minutes" without the exchange.
It was also said that the mother's blood should be cross matched with the donor blood because it was likely that some of the mother's blood was still in Debra's body. They further stated that blood less than 72 hours old was needed.
*1176 Although we agree that Debra continued to show some clinical signs of advancing kernicterus during the morning, appellants did not or could not show or determine the rate at which the injury was progressing nor the time which it commenced. Dr. Garrison said in deposition that jaundice becomes observable to a "good nurse" at about 6 or 7 milligrams bilirubin and that, given Debra's unconjugated bilirubin level (33.09) at about 5:30 that morning, her condition could have begun to develop as much as 24 hours earlier. Dr. Garrison did not explain whether or how the rate at which bilirubin rises can be calculated.
Under these circumstances, it can be concluded that Dr. Cummings could not have determined the extent of Debra's brain damage at 7:45 a.m. when she ordered cross matching. Although Debra's symptoms clearly worsened thereafter, Dr. Cummings' decision that a universal exchange would have placed Debra's life in greater danger than would additional exposure to hyperbilirubinemia was a medical judgment upon which competent pediatricians could and did differ. Given this direct conflict in medical testimony, the jury's implicit finding that the cross matching procedure described by defense experts was acceptable practice is not manifestly erroneous or clear error.
Appellants also complain that Dr. Cummings, as "captain of the ship" during this emergency, should have hastened preparations for the exchange by directly contacting the lab and blood bank and by remaining at the hospital to directly supervise hospital personnel instead of returning to her office and waiting for the hospital to call when everything was ready. The head RN of the nursery testified, however, that Dr. Cummings did all she could have done or was permitted to do within the hospital's regulations of separate responsibility and supervision of its personnel. Given the finding that cross matching was necessary and considering the testimony of doctors and nurses about the procedure and delays required for typing and assembling of blood for an exchange, the jury could have found that Dr. Cummings did all a reasonable, competent pediatrician could have done under the circumstances. This finding, also implicit in the verdict, is supported and is not manifestly erroneous.

3. Delay in Ordering and Administering the Second Exchange Transfusion.

Dr. Cummings acknowledged that Debra's high bilirubin level called for more than one exchange transfusion, but explained that Debra's instability during the first exchange made a second exchange risky and that the results of the first exchange could not be determined for several hours.
The experts agreed that exchanges should be performed "as often as necessary" to reduce bilirubin to a safe level. The experts differed, however, on whether an immediate second exchange would sufficiently reduce Debra's bilirubin to justify the risk of such treatment, given Debra's condition.
The success or effects of an exchange are not apparent or measurable immediately after it is completed. It was explained that even after bilirubin-rich blood is removed from the blood vessels, the organs and tissues of the body remain saturated with toxins. The experts described a "rebound" effect whereby the fresh blood absorbs residual blood from the organs and tissues to eventually become uniform or consistent, reaching equilibrium. A doctor can then determine how much the first exchange reduced the bilirubin and can assess the need for a second exchange.
On the one hand, Dr. Garrison described two "rules of thumb" that Dr. Cummings should have used to predict the need for a second exchange far in advance of 3:00 p.m. First, he said, that if the bilirubin level immediately prior to the exchange is known, then a doctor can be reasonably sure that once equilibrium is reached, bilirubin will have been reduced by one-half. Second, he said, if the bilirubin level immediately after an exchange is known, the bilirubin level can be expected to rise about *1177 15 percent per hour until equilibrium is reached.
Debra's bilirubin just before the first exchange at 10:45 a.m. is unknown because the test that showed 33.09 bilirubin was taken from a 5:45 a.m. blood sample. Dr. Cummings ordered the second exchange transfusion at 3:00 p.m., about three hours after the first exchange was completed. The second exchange was not commenced until 5:45 p.m., almost six hours after the first exchange was completed. During this time Debra continued to show clinical signs of advancing kernicterus. Appellants contend that Debra would not have suffered additional brain damage if Dr. Cummings done the pre- and post-exchange bilirubin tests beginning at 10:45 a.m. and had recognized the need for an immediate second exchange.
The experts disagreed on the amount of time required for fresh blood to reach equilibrium after an exchange. Dr. Garrison said a delay of only 30 minutes to one hour should yield a reliable test result. Dr. Cummings estimated eight hours. Dr. Cotter said a bilirubin taken about four hours after an exchange yields a figure "you can hang your hat on." The head nurse in the nursery said, based on her 19 years of working and observation in the Schumpert maternity ward, doctors do not always do a post-exchange bilirubin, presumably even in less severe cases where the test would be more useful in determining whether a second exchange is needed. She also said a three hour delay between the first exchange and the second test was shorter than usual.
Dr. Cummings said she was aware that Debra's condition at 7:45 made it obvious that a single exchange would not bring Debra's bilirubin under control. She also said that exchange transfusions should be performed when the infant first shows signs of kernicterus, regardless of the bilirubin level, but that signs of kernicterus may persist for days after bilirubin is reduced to safe levels. Under these circumstances, the jury did not manifestly err in implicitly finding that Dr. Cummings' failure to monitor Debra's bilirubin level immediately before and after the first exchange was not essential to her care or substandard.
Appellants also contend that the nearly six hour delay in administering the second exchange was unnecessary, given Dr. Cummings' knowledge, as early as 7:45 that morning, that an additional exchange would be required. They contend she should have ordered preparations for the second exchange before the first exchange was completed, if not at 7:45 when she arrived at the hospital.
As noted, Debra suffered breathing difficulty (apnea) during the first exchange. The experts differed on whether apnea was caused by the illness that elevated her bilirubin or by the elevated bilirubin itself. The head nurse testified that the delay between infant blood exchanges is usually eight hours and included time allowed for the bilirubin "rebound," for a reliable second test, and for the preparation for a second exchange if necessary. The fact that the second exchange was commenced within six hours of the first could have been understood by the jury as an expedited or additional effort that was taken under emergency circumstances. Additionally, the jury could have found some time was warranted for Debra's recovery from the first exchange to avoid further risk of death.
Drs. Cummings and Gustafason testified in detail about Debra's condition during and after the first exchange. They said that Debra went into "shock" even though tests within one hour of the first exchange showed normal levels of sodium and other elements in her blood. They were unable to say Debra suffered a "vascular collapse" often associated with shock from blood loss, but said that the exchange process is so stressful that some recovery time is necessary between exchanges. Dr. Cummings said that she did not believe Debra would even survive the first exchange.
Debra's poor condition during the first exchange is corroborated by Dr. Cotter's opinion that her hyperbilirubinemia was *1178 caused by sepsis, a blood infection. There is evidence that antibiotics prescribed by Dr. Kelly early Monday morning were for treatment of a blood infection. Dr. Cotter said this condition would also make a universal exchange even more risky because it reduces the body's resistance to antibodies that might be present in mismatched blood.
Dr. Garrison, however, countered, saying that if Debra had been suffering from sepsis, her conjugated bilirubin level of 1.69 would have been a much higher percentage of her total bilirubin of 34.78. (The 33.09 figure represents unconjugated bilirubin.) He also said that, "using current techniques and monitoring," he considered the blood exchange procedure a "relatively nonstressful situation" and "very little more than drawing a blood sample."
In light of this sharply conflicting medical testimony, we cannot conclude that the jury manifestly erred in finding that the delay between the exchanges was not necessary to avoid the risk of death demonstrated by Debra's unstable condition during and immediately after the first exchange.
In summary, the record supports the ultimate conclusion that Dr. Cummings, when made aware of Debra's grave condition, took immediate steps under then-accepted pediatric practices to reduce Debra's bilirubin level in a manner that minimized the risk of death. The several conflicts in expert testimony have as a common denominator the broad question of whether the emergency crash procedure proposed by Dr. Garrison would have afforded, in the expressed view of each expert, a reasonable degree of safety to Debra's life under the circumstances of her condition.
Unlike Drs. Cummings and Cotter, Dr. Garrison testified without benefit of firsthand knowledge of the postnatal care proceudres and practices at Schumpert in 1974. Although not at Schumpert in 1974, Dr. Webb served as head of pediatrics at another Shreveport hospital for 20 years and Dr. Gustafason was on staff at Schumpert from 1980 to 1982. Dr. Garrison's testimony is statutorily admissible and relevant to the standard of care, but need not necessarily be given the same or greater weight by the jury as that of the other physicians, which the jury could have found categorically and unequivocally supported every aspect of Dr. Cummings' action and judgment. The jury's determination of each of the specific allegations of negligence rests on their evaluation of differences in the experts' credibility, experience, and medical judgment. The jury's findings are supported and not clearly erroneous, even though the opinion evidence conflicted.

COMMENTS MADE DURING OPENING STATEMENTS
Appellants complain that these comments made by defense counsel during opening statement amount to an improper reference to their settlement with Schumpert and its insurer:
Our defense in this case is notand I repeat[is] not that the nurses at Schumpert were negligent. Our defense in this case is that in December 1974, over ten years ago, when Dr. Cummings was treating this child, Dr. Cummings didn't do anything wrong.
So the thought might occur to you, why were you telling us yesterday or asking us yesterday, would you have any hesitancy in finding that the hospital was negligent? The reason that I asked you that question is because that is one of the questions that you are going to have to decide in this case and I'm not allowed to tell you why you are going to have to decide that. You are going to have to figure that out for yourselves.
My defense in this case, or more properly speaking, Dr. Cummings' defense in this case is that she didn't do anything wrong. This second issue, if you want to call it that, about: did the nurses do something wrong?, you are going to have to decide that question but you are going to have to figure out why you are going to have to decide that. I'm not allowed to tell you. *1179 Appellants' complaint about these remarks was not by contemporaneous objection, but was first made in an application for new trial which was denied by the trial court.
Dr. Cummings argues that the comment cannot be reasonably construed to infer any settlement. She argues that she would be entitled to some reduction of any jury award to reflect the settlement and that the comments were intended only to direct the jury's attention to this "viable issue."
Settlement with one tortfeasor is not admissible to show that the released tortfeasor was also guilty of negligence that contributed to the harm. The amount of settlement is not admissible for any purpose. Hebert v. Ordoyne, 388 So.2d 407 (La.App. 1st Cir.1980).
We do not interpret counsel's remarks to imply that there was a prior suit against Schumpert and its insurer that was later dismissed. The comments were intended to suggest to the jury that it would be called upon to determine whether Schumpert nurses were negligent in the event Dr. Cummings was found negligent. Dr. Cummings had the burden of proving the negligence of released defendants. Raley v. Carter, 412 So.2d 1045 (La.1982). The trial judge expressly instructed the jury of this burden and the special verdict form provides spaces for these findings, specifically naming nurses Small, Black, and Paxton.[1] The trial judge also instructed the jurors not to concern themselves with the "effect" of the nurses' negligence on the liablility of Dr. Cummings, and explained that that was a matter which be "handled by the court."
Regardless of how the jurors may have construed the complained of comments, appellants have not demonstrated, but for the comments, the verdict would have been in their favor. The record would support the jury's findings even without the comments. Under the described circumstances, a new trial is not warranted.
The trial court's instructions expressly told the jury of its responsibility to determine whether the nurses were negligent and not to be concerned with the effect of such negligence on their finding whether Dr. Cummings was or was not negligent, a more emphatic statement than the comment to the jury by Dr. Cummings' counsel.
At appellants' cost, the judgment is AFFIRMED.
NOTES
[1] 1. Do you find from a preponderance of the evidence that Dr. Anna D. Cummings was negligent which was a proximate cause of Debra Butts' injuries?
Yes_____ No X 

If your answer to Question No. 1 is "No," disregard the rest of this form. If your answer to Question No. 1 is "Yes," then answer the remaining questions.
2. Do you find from a preponderance of the evidence that Evelyn Small was negligent which was a proximate cause of Debra Butts' injuries?
Yes_____ No_____
3. Do you find from a preponderance of the evidence that Anita Black was negligent which was a proximate cause of Debra Butts' injuries?
Yes_____ No_____
4. Do you find from a preponderance of the evidence that Gail Dunahoe Paxton was negligent which was a proximate cause of Debra Butts' injuries?
Yes_____ No_____