490 So.2d 307 (1986)
Henry A. SIBLEY, III, Curator of Jane Elizabeth Sibley, Interdict
v.
BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY and Agricultural and Mechanical College.
No. 83-CA-0411.
Court of Appeal of Louisiana, First Circuit.
May 28, 1986.
Rehearing Denied July 15, 1986.
*308 David W. Robinson, and Steve Marks, Baton Rouge, for Plaintiff-Appellant Henry A. Sibley, III, Curator of Jane Elizabeth Sibley, Interdict.
Vincent Fornias, Baton Rouge, for Defendant-Appellee Bd. of Supervisors of La. State University and Agricultural and Mechanical College.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
EDWARDS, Judge.
This is a medical malpractice action for injuries suffered by a patient during her *309 hospitalization and treatment in Confederate Memorial Medical Center, a teaching hospital of the state university.[1] The trial court rendered a judgment for plaintiff for $500,000, the malpractice liability limit set in LSA-R.S. 40:1299.39. This court affirmed, Sibley v. Board of Supervisors, 446 So.2d 760 (La.App. 1st Cir.1983), and the Supreme Court affirmed, Sibley v. Board of Supervisors, 462 So.2d 149 (La. 1985). On rehearing the Supreme Court affirmed that portion of the trial court judgment which found the LSU Board liable for the malpractice of its health care providers and awarded costs to the plaintiff, but reversed in part, and remanded to this court with certain instructions. Sibley v. Board of Supervisors, 477 So.2d 1094 (La.1985).
While this case was in the appeal process, the statutory limitation on liability was amended to make the $500,000 limitation "exclusive of future medical care and related benefits," and that amendment was expressly made retroactive. 1985 La. Acts. 239. The Supreme Court read Act 239's allowance of unlimited liability for "future medical care and related benefits" to mean unlimited liability for "all reasonable medical" care.[2] 477 So.2d at 1099 (emphasis added). Consequently the Supreme Court has instructed us to award plaintiff medical expenses accordingly.
The Supreme Court held that the limitation on liability is not applicable to any direct or independent negligence of the LSU Board. Thus to the extent that the Board is determined to be directly or independently negligent, the $500,000 limit does not apply. Because the court did not determine whether the Board was independently negligent, the constitutionality of the limitation was not then squarely presented. However, the court did conclude that the federal three-tier system of constitutional scrutiny is inappropriate for interpreting and applying the protection of our State constitution. The court then propounded a new test for determining whether a law offends our State constitution's guarantee of equal protection. La. Const. art. I § 3.
Accordingly the Supreme Court has instructed us to determine from the record the damages Sibley suffered other than medical expenses and whether the LSU Board is directly and independently liable for her injury and disability. If we find that the LSU Board is not directly liable and that Miss Sibley's damages other than medical expenses exceed $500,000, the Supreme Court has instructed us to remand the case to the trial court so that the parties may litigate the constitutionality of the $500,000 limitation in light of the Supreme Court's new standard for determining constitutionality.

MEDICAL EXPENSES
At the time of trial Miss Sibley's medical expenses amounted to $420,950.60.[3] The record establishes that Miss Sibley will need future medical care and related benefits for the rest of her life. Plaintiff established the continuing necessity for hospital care; around-the-clock attendant care; physical, occupational, and speech therapy; psychological services; medical and rehabilitative coordinators; administrative services; and medical consultations. Melvin Meyers, Jr., President of National Rehabilitative Services, Inc., in Baton Rouge, estimated *310 the total annual cost of these services to be $221,949.35.[4]
Act 239 requires the court to specify an amount where future medical expenses are indicated. 1985 La. Acts 239, Section 1, La.R.S. 40:1299.39(B)(1). The Act is unclear, however, as to the terms in which the amount should be stated. Were it not for Act 239, we would follow the usual procedure of stating the award in a lump sum discounted to present value. We believe, however, that Act 239 mandates that future medical benefits in this case be paid only as they accrue. The claimant must make a claim to the future medical benefits fund, and the administrator of the fund has the right to determine from time to time whether the claimant continues to need future medical benefits. Id. § B(6), (9). Furthermore a proceeding may be brought to terminate future medical benefits, id. § B(12), in the trial court from which the judgment issues, since that court maintains continuing jurisdiction. Id. § B(4). This scheme is somewhat analogous to that for alimony and child support awards, in which the judgment is cast in terms of a periodic amount, but the trial court maintains continuing jurisdiction for the purpose of modifying the judgment as needed. Consequently, we will cast the judgment for future medical expenses in terms of an annual amount, rather than a total amount discounted to its present value.
Contending that it should not have to maintain Miss Sibley in a private medical institution, the State argues that the annual amount for medical care is excessive. It is true that plaintiff's estimates for medical care are based on the cost of care in the Baton Rouge General Hospital Annex, a private institution where Miss Sibley is now. Mr. Meyers, however, testified that there is no State institution capable of offering the complex care Miss Sibley needs, though he admitted that he made no study as to the availability of federal institutions. Dr. Donald Emerson Bowers, a rheumatologist and internist who had been treating Miss Sibley at the Baton Rouge Annex, said that the Baton Rouge Annex is the best place for her care. He said that there might be other institutions which are better in some ways, but that the Baton Rouge Annex is close to family and friends, which is very important to her progress. The evidence supports the need for the maintenance of Miss Sibley in a private medical institution. We therefore award medical expenses in favor of plaintiff as follows: $420,950.60 for past medical expenses, together with judicial interest from date of demand, or date expenses were incurred, whichever is later; and $221,949.35 per year for future medical expenses.[5]

INDEPENDENT NEGLIGENCE OF THE LSU BOARD
The question of liability has long been settled. Indeed the plaintiff won a judgment against the LSU Board in the trial court based on vicarious liability for medical malpractice in this teaching hospital, and the Board did not appeal. The only issue on appeal is and always has been whether the $500,000 limitation of liability applies. Now that the Supreme Court has concluded that the $500,000 limit does not apply to the LSU Board's direct (as opposed *311 to vicarious) liability, we must determine whether the LSU Board was directly liable, although the LSU Board's vicarious liability has already been established and a $500,000 definitive judgment already stands against the LSU Board. In short, the operative phrase is direct negligence of the LSU Board.
It is beyond argument that the members of the LSU Board, most of whom are not health care professionals, have no actual direct involvement in the day-to-day activities of the hospital, and consequently were not in any way directly involved in Miss Sibley's case. Plaintiff's counsel bases his direct negligence argument on the fact that the LSU Board represents the hospital, i.e., the corporate body. Thus, although the Board delegates the responsibility of the actual running of the hospital to the Hospital Clinical Board, made up of doctors, the Board still represents the institution itself, and is therefore directly responsible for any institutional negligence. Defendant, on the other hand, argues that since any institutional negligence would be the direct responsibility of the Hospital Clinical Board, because the Clinical Board is made up of doctors who are clearly covered under the malpractice limitation of liability provisions, plaintiff cannot recover more than the $500,000 limit, even for institutional negligence.
The very fact that the Supreme Court remanded to this court for a determination of whether there was any direct negligence of the LSU Board seems to belie defendant's argument. Although the Court did not discuss this question, it would be absurd for it to remand to this court with instructions to make such a determination if, as a matter of law, such negligence were covered under the malpractice limitation of liability. Indeed the Supreme Court opinion seemed to equate institutional negligence with LSU Board negligence. Nonetheless, after a thorough examination of the record, we have found that plaintiff simply has not proved institutional negligence.
Since plaintiff wishes to establish that the LSU Board was directly negligent, and therefore subject to unlimited liability, the first step in determining if such negligence existed is to determine what duty the LSU Board had to Ms. Sibley.

HOSPITAL'S DUTY TO PATIENT
A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect the patient from dangers that may result from the patient's physical and mental incapacity as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case.
Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La.1974).
A hospital has a duty to provide and maintain adequate facilities and supplies and a competent staff so as to provide competent care to its patients. See Sibley v. Board of Supervisors, 477 So.2d at 1099 and cases cited therein. Yet hospitals are not insurers of their patients. Ray v. Ameri-Care Hospital, 400 So.2d 1127, 1138 (La.App. 1st Cir.), cert. denied, 404 So.2d 277 (La.1981). As to what constitutes reasonable care under the circumstances of this case, plaintiff relies on the hospital by-laws and the guidelines of the Joint Committee on Accreditation of Hospitals. Although in the past, hospitals were judged by a community standard,[6] since Hunt v. Bogalusa Medical Center, this is no longer the case. See Id.
The Joint Commission on Accreditation of Hospitals has set certain criteria by which a hospital is judged. See Joint Commission on Accreditation of Hospitals, Accreditation *312 Manual for Hospitals (1980). Thus for accreditation purposes, a hospital is judged by a national standard. The JCAH does not require one hundred percent compliance with every item in its standards applicable to a given hospital. Rather, accreditation decisions are based on a careful and reasonable assessment of each individual case. Yet, the accreditation manual is evidence of what the medical profession considers necessary for competent medical care.
To this end hospitals have internal regulations, set certain policies, and maintain a system of committees, each monitoring a different aspect of the hospital. Consequently, we believe that the proper standard must be based on the guidelines of the Joint Commission on Accreditation of Hospitals (which are evidence of standards throughout the country), and the hospital by-laws (which are to some extent evidence of community standards).
We turn now to plaintiff's specific allegations of negligence against the hospital.
1. The team treatment system and the way the hospital implemented it allowed medical students to make treatment decisions and guaranteed that the least experienced persons would spend the most time with the patient.
2. The medical record procedures were inadequate in that Ms. Sibley's records failed to indicate her drug toxicity symptoms, and the administration of certain dangerous medications were never recorded.
3. Failure to monitor or review plaintiff's treatment.
4. The lack of a policy requiring a pharmacological consultation.
5. Allowing standing orders for dangerous drugs to be administered on an as needed basis.
6. Failure to require an initial drug free period of observation of new patients before formulating a treatment plan.
The first two deal with basic procedures involved in the everyday running of the hospital.
Team Treatment:
First, plaintiff's counsel contends that the hospital's very use of the team treatment system was negligence. A review of the record makes it abundantly clear that the team treatment system is used in all teaching hospitals, and that despite its shortcomings, it is considered by health care professionals to be the best available method of dispensing competent medical care while training physicians. There is no evidence in the record that LSU's implementation of the team system is essentially different from that of any other teaching hospital.
Least Experienced Staff Members:
Counsel complains that the system guaranteed that the least experienced persons on the team would spend the most time with the patient. We can only say that this is true in any hospital, since the physician normally sees the patient for a very small portion of the time, while nurses, aides, and volunteers spend the most time with patients. The record indicates that Dr. Steinberg saw Miss Sibley two or three times a week and consulted with the residents and interns approximately five times a week.
Despite counsel's allegations that the interns and residents were making treatment decisions, the record clearly shows that they constantly conferred with Dr. Steinberg, the staff attending physician who was the team leader, and that the ultimate treatment decisions were his. Counsel alleges that on one occasion a medical student wrote an order, but counsel overstates the facts. Hospital policy allows medical students to write proposed orders, but requires them to be signed by a physician before they are carried out. The record reveals that on the occasion in question, a medical student wrote a proposed order, but that it was modified and then signed by Dr. Steinberg before it was carried out. We see no negligence in such a policy.
*313 Inadequate Medical Records:
Plaintiff contends that the medical record procedures were inadequate, violating even the hospital's own by-laws, which charged the Medical Record and Auditing Committee to "supervise the maintenance of medical records at the required standard of completeness, advise and recommend policies for medical record maintenance and supervise medical record organization and content to insure that details are recorded in the proper manner and that sufficient data are present to evaluate the care of the patient."
Plaintiff claims that Miss Sibley's records failed to indicate her drug toxicity symptoms and that the administration of certain dangerous medications was never recorded. Plaintiff's expert witness, Dr. Ayd, said that the patient may have had certain symptoms which, had they been recorded, would have helped to clarify the diagnosis. He went on to say that there were times when medication was recorded in the nurse's notes, but not in the medication record. There were other times when medication was recorded in the wrong place. We have been unable to determine, however, that these alleged medication recordation errors resulted in the treatment teams being unaware that the medication had been administered. On the contrary, the record shows that members of the staff did know that Miss Sibley was getting many different medications; indeed this was precisely their plan to treat her illness. The physicians chose to follow the polypharmacy route; it did not happen accidentally.
Plaintiff's counsel suggests in brief that Dr. Steinberg himself had difficulty during the trial deciphering the medical records. It is true that Dr. Steinberg had to take extra time on occasion to make out some of the handwritten entries on the copies of the medical records. It must be remembered, however, that at that point Dr. Steinberg had not looked at those records for over a year, and he was reading from copies rather than originals. Furthermore, we note that there was never a time during his testimony that he was ultimately unable to decide what was written in the record. This evidence is simply not sufficient to show that inadequate records procedures caused Miss Sibley's damage.
The remaining allegations of direct negligence have to do with the medical treatment. Plaintiff claims that the hospital was negligent because it did not properly supervise the actual medical treatment Miss Sibley received. Traditionally medical treatment has been thought to be the exclusive province of the doctors, the nurses, and other health care professionals. Yet the role of the hospital has changed. Hospitals are no longer merely room and board institutions; they now take an active part in providing medical treatment to patients. Indeed, the fact that the Joint Commission on Accreditation of Hospitals requires monitoring of medical treatment is evidence that the medical profession itself believes that the hospital as an institution has taken an increasingly large role in the actual medical care of its patients. And as the role of the hospital has changed, so has its legal position in regard to supplying medical care. See Annot., 12 ALR 4th 57 (1982).
Courts in some jurisdictions have adopted a doctrine of corporate responsibility which imposes upon a hospital a direct duty to the patient in connection with his treatment, and consequently holds the hospital liable for its own negligence, even in the absence of any negligence on the part of the physician. See, e.g., Bost v. Riley, 44 N.C.App. 638, 262 S.E.2d 391 (1980); Holton v. Resurrection Hospital, 410 N.E.2d 969 (Ill.App.1980); Darling v. Charleston Community Memorial Hospital, 33 Ill.2d 326, 211 N.E.2d 253 (1965).[7]
*314 Although several other jurisdictions have imposed upon hospitals a duty to review and supervise medical treatment, no court of this state has ever held a hospital liable for failure to supervise medical treatment. A hospital's control of the medical treatment received by its patients is indirect and somewhat limited. Nonetheless, by its authority to grant and revoke staff privileges, a hospital exercises a certain degree of control over the quality of medical care provided. A hospital's duty and corresponding liability for breach of that duty is in direct proportion to its right to control the medical treatment rendered there.[8] And to the extent that the hospital has within its control the medical treatment given there, according to Hunt, it has a "duty to protect a patient from dangers that may result from ... external circumstances peculiarly within the hospital's control." Hunt, 303 So.2d at 747. For example, a hospital which negligently granted staff privileges to an incompetent physician would be directly liable to a patient damaged by that physician's incompetence over and above its vicarious liability for that physician's malpractice.[9]
Because hospitals have such a large role in present-day medical care, they have a corresponding duty to patients to review and monitor medical treatment. Nonetheless institutional negligence is not proved merely by proving malpractice against a doctor in the hospital. Hospitals are not required to insure patients against physician malpractice. Accordingly we have examined the record thoroughly in light of plaintiff's allegations in this regard and yet concluded that no institutional negligence was shown.
Failure to Monitor Treatment:
Plaintiff complains that the hospital breached its own by-laws, which charge the clinical board "with the supervision and maintenance of excellent patient care," LSU Hospital By-laws, as well as the JCAH standards, which require continuous monitoring and review of patient care. Joint Commission on Accreditation of Hospitals, Accreditation Manual For Hospitals, 102-108 (1980). The record does not support this allegation.
Dr. Steinberg testified that the hospital had committees to review hospital activities, including patient care, and that he had served on some hospital committees. Though stating that there were many committees, Dr. Steinberg specifically mentioned a Pharmacology and Therapeutics Committee, a Medical Record Committee, and a Utilization Review Committee. According to the by-laws, most committees meet at least once a month. The Medical Record and Auditing Committee reviews "the quality of medical care given the patient by supervising and reviewing the monthly medical audit program conducted by each clinical service." The Utilization Review Committee is "responsible for the overall surveillance of the quality of patient care through review and evaluation of medical records, of the clinical aspects of medical and surgical care, and of utilization." This committee has the "authority to review the medical record of any patient *315 in the Hospital, during hospitalization or after discharge, and to discuss the case with the patient's attending physician." The Clinical Board has the authority to take corrective action. LSU Medical Center By-laws, 81-82.
The Pharmacy Committee, which meets at least quarterly, is "responsible for the development and surveillance of all drug utilization policies and practices within the hospital in order to assure optimum clinical results and minimum potential for hazard." Id. at 83. Thus it is clear from the record that the hospital did have systems and policies to monitor hospital treatment in an effort to maintain high standards of patient care. We reject plaintiff's argument that Miss Sibley's tragedy proves that no proper review system could have been existing at the time, i.e., that malpractice cannot occur if the hospital is doing its duty to the patient. Although any person in a hospital would no doubt feel safer if he could be assured that there was continuous monitoring of his specific treatment by a second team of doctors, it is unreasonable to expect such. Hospitals supervise medical treatment by medical staff peer review through quality assurance programs. Note, 17 Wake Forest Law Review 319 (1981). It would be absolutely impossible for hospital review procedure to review every case. Of course it is possible that committees might exist in name only, and yet be nonfunctional. Yet plaintiff offered no such evidence.
Pharmacological Consultation:
Although the hospital did not have a formal policy requiring a pharmacological consultation in cases such as Miss Sibley's, defendant's own witness, Dr. Seiden, who had completed a residency at the LSU Medical Center, testified that pharmacologists were on the staff of the hospital and consequently that pharmacological consultations were available. Furthermore the deposition of Dr. Helmut Redetzki, a pharmacologist on staff at the hospital, was admitted into evidence. Thus the hospital did have a pharmacology department and it encouraged consultation. Once a hospital makes a pharmacological consultation possible, it is really the physician's own judgment as to when such a consultation is necessary. If plaintiff's team was negligent in not having a consultation with pharmacology, that goes to malpractice on their part rather than to direct hospital negligence. Plaintiff's expert witness, Dr. Ayd, testified that it was the doctor's legal and moral duty to consult with pharmacology in Miss Sibley's case.
Standing Orders for Benadryl:
Plaintiff's expert witness, Dr. Ayd, testified that it is "outside the bounds of rational pharmacotherapy," and "below the standard of care for a skilled psychiatrist" to issue a standing order for Benadryl to be given when the nurses felt it necessary. On the other hand, defendant's expert witness, Dr. Kline, testified that it is common to have standing orders for Benadryl in cases such as Miss Sibley's.
Although we make no determination as to whether the order itself represents malpractice on the part of the doctor, we conclude only that there is insufficient evidence in this record from which we can conclude that the hospital was negligent by not having a policy prohibiting standing orders for Benadryl. In accordance with the JCAH standards requiring that standing orders for medication be qualified, we note that the standing orders given in Miss Sibley's case limited the amount of the drug to be given, stated the circumstances under which it was to be given, and set a maximum dosage allowable within a given time frame.
Drug-Free Observation Period:
Both plaintiff's and defendant's expert witnesses testified that they believed that psychiatric hospitals should require an initial drug-free period of observation of new psychiatric patients before formulating a treatment plan. Defendant's expert, however, testified that it is definitely not common practice for psychiatric hospitals to have such a rule. Again this issue goes more to the judgment of the doctor (and there appears to be a divergence of opinion within the profession) than to the hospital's *316 policy making function. Therefore we find no negligence of the hospital in this regard.
In short, the evidence, while clearly supporting a finding of medical malpractice, does not support a conclusion that the hospital breached its duty to Miss Sibley. Therefore, the LSU Board, representing the institution, is not directly or independently liable for Miss Sibley's damages.

NON-MEDICAL DAMAGES
Pursuant to the Supreme Court's directive, we now specifically determine the amount of general damages. Miss Sibley's respiratory arrest occurred on September 15, 1980, and she was in a coma for some time thereafter. When she was transferred to the Baton Rouge Annex in January 1981, she had a tracheostomy in place, a permanent gastrostomy in place for feeding purposes, and an in-dwelling catheter. She had virtually no use of her extremities, her head and neck moved in wild jerking motions, she showed no recognition of what was going on around her, and her mouth was locked in an open position.
She has improved considerably since that time. She no longer has a catheter, though the tracheostomy and gastrostomy are still necessary. She now has some use of her upper extremities, though still no use of her lower extremities. Oral surgery has corrected to some extent the open mouth problem. Nevertheless she still has significant neurological deficits, which have resulted in profound physical disabilities.
Miss Sibley is able to swallow, to breath on her own (though the tracheostomy must be suctioned periodically), to move her upper extremities somewhat, to hear and see, and indicate what she has seen and heard, though her means of communication is very limited. She is not able to stand or walk or get out of bed. She is not able to dress herself or to cover herself. She can roll over in the bed and grab hold of the handrails to change her position from time to time.
She is now quite responsive to her environment, enjoying TV programs, even recalling the program time; expressing preferences for certain food; recalling her high school days and friends; and talking about marriage and a home of her own. She is incapable of verbal communication; she has learned to spell out words on a large alphabet board to communicate. Dr. Darlyne Nemeth, a neuropsychologist who tested Miss Sibley over a period of several months, testified that she has an I.Q. of 77, which is classified in the borderline to dull/normal range. Dr. Nemeth emphasized that Miss Sibley is brain damaged, but not retarded. Dr. Nemeth noted that Miss Sibley is capable of experiencing needs and emotions. This is demonstrated by the fact that Miss Sibley experiences embarrassment at her incontinence, that she becomes upset when she is left out of conversations or treated as though she were retarded, and that she responds favorably to praise and encouragement.
All of the doctors agreed that though some improvement can be expected, Miss Sibley will never be functional again. Furthermore, without proper care and therapy, she will likely deteriorate further.
We have reviewed damage awards in recent cases in an effort to obtain some guidance in determining the amount of Miss Sibley's general damages. In LeRay v. St. Paul Fire & Marine Ins. Co., 444 So.2d 1252 (La.App. 1st Cir.1983), cert. granted, 448 So.2d 108 (La.1984), dismissed as moot, 452 So.2d 1174 (La.1984), this court affirmed a $1,700,000 general damages award to a thirty-three year-old plaintiff who had suffered moderate brain damage which resulted in slow, uncoordinated and spastic movement, the need for reeducation in how to talk, constant need for physical therapy and learning rehabilitation, and inability to ever gain independence, though he was able to live at home with his parents. The record indicates that Miss Sibley must remain hospitalized for the rest of her life. Her brain damage is much more severe than LeRay's. She is unable, and will always be so, to even get out of bed. She is completely dependent on others for even her physical survival. The record in the *317 instant case supports a general damage award of $2,000,000.
Because we have concluded that plaintiff proved no independent negligence of the LSU Board, and that Miss Sibley's non-medical damages exceed $500,000, the constitutionality of the $500,000 limit is now squarely presented. We must therefore remand.

DECREE
The case is remanded to the district court, and the court is ordered to enter judgment in favor of plaintiff as follows: $420,950.60, together with judicial interest from date of demand, representing past medical expenses, and $221,949.35 per year from the date of trial for future medical expenses. The court is further ordered to decide whether LSA-R.S. 40:1299.39 is constitutional insofar as it limits medical malpractice liability to $500,000, after affording both parties an opportunity to adduce evidence and present arguments. The Supreme Court awarded costs to plaintiff. Therefore the trial court is further ordered to assess against the State appeal costs of $50.00 and trial costs in accordance with LSA-R.S. 13:5112.
NOTES
[1] For a detailed recitation of the facts, see our earlier opinion at 446 So.2d 760 (La.App. 1st Cir.1983).
[2] We surmise that the court's reasoning was based on the fact that Act 239 defines future medical care and related benefits as

all reasonable medical, surgical hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services. "Future medical care and benefits" as used in this Section shall not be construed to mean nonessential specialty items or devices of convenience.
1985 La. Acts 239.
[3] This total includes $363,964.05, the cost of Miss Sibley's care from April 1981 to the time of trial, which plaintiff had already paid; and $56,986.55 due the LSU Medical Center for Miss Sibley's hospitalization there from August 1980 to January 1981, which had not been paid at the time of trial.
[4] Plaintiff's economist, Dr. John W. Chisholm, used this annual amount to estimate the total cost of Miss Sibley's future medical care. At the time of trial, Miss Sibley was twenty-one. Dr. Chisholm based his calculations on the ordinary life expectancy of a twenty-one-year-old female, that is 55.7 years, or to the total age of 76.7. His best estimate as to the annual increase in the cost of medical care over a 55-year period was 7% per year. Then, after discounting the total amount for the 55.7 years by 8%, he arrived at a total present value of $9,080,137.88.

We need not consider defendant's argument that the normal life expectancy for a twenty-one-year-old female is inappropriate for Miss Sibley. Pursuant to Act 239, we state the future medical expenses award in terms of a yearly amount, and plaintiff simply makes claims again the future medical benefits fund as needed. We note, however, that Dr. Bowers said that Miss Sibley should live to be an old lady, so long as she receives proper care.
[5] The date of trial is the operative date for distinguishing past and future medical expenses. Thus future medical expenses began accruing as of January 1983.
[6] See, e.g., Lauro v. The Travelers Insurance Co., 261 So.2d 261, 268 (La.App. 4th Cir.), cert. denied, 262 La. 188, 262 So.2d 787 (1972).
[7] It is sometimes quite difficult to distinguish between the institution's responsibility and the physician's responsibility for patient care in a hospital. It is then correspondingly difficult to determine whether the appropriate legal theory is corporate negligence or respondeat superior. For this reason, some authorities have called for the elimination of the distinction. See, e.g., Southwick, Hospital Liability, 4 J. Legal Med. 1, 28-29 (1983). By its holding in this case, however, our Supreme Court has embraced the idea of making a distinction.
[8] See, e.g., Pogue v. Hospital Authority of Dekalb County, 120 Ga.App. 230, 170 S.E.2d 53 (1969) (Hospital was not liable for failure to supervise emergency room treatment since the hospital had no right to control or supervise physician/member of partnership with which hospital had contracted to operate emergency room.) We do not intend to imply, however, that a hospital may avoid this duty by refusing to take responsibility for medical treatment. In any event, to receive the much sought after accreditation, a hospital must take responsibility for monitoring the medical treatment.
[9] In Trichel v. Caire, 427 So.2d 1227 (La.App. 2d Cir.1983), plaintiff sought recovery from a hospital, alleging that it was negligent in granting her doctor privileges to perform a postpartal hysterectomy when he was not a board certified Ob-Gyn Specialist, and therefore, according to plaintiff, not qualified to do that surgery. The court, however, concluded that the doctor did possess the necessary skill and experience to competently perform this emergency surgical procedure in the care of his patient, and consequently a discussion of hospital negligence in this context was unnecessary.