JiLANDRIEU, Judge.
In this medical malpractice action, plaintiffs, Marcus S. Griffin, Sharon Griffin Anzel-mo and Edward Griffin, appeal the judgment rendered in favor of Southern Baptist Hospital, Inc. (SBH). We are asked to determine whether the trial court erred when (1) it failed to instruct the jury as to a hospital’s duty with regard to granting staff privileges to physicians when the evidence did not support any liability under this theory and (2) it determined that Southern Baptist Hospital did not breach its duty to the patient, Marcus Griffin, and cause his damages. Finding no error in the judgment of the trial court, we affirm.
FACTS
At approximately 5:80 a.m. on November 13, 1964, plaintiff Sharon Anzelmo gave birth to a child at SBH. Because Marcus Griffin was born prematurely, weighing only two pounds 13 ounces, he was placed in an incubator and administered oxygen. This oxygen treatment continued from the date of birth through November 30 or December 2, 1964.
_j2Alleging medical malpractice,, plaintiffs filed this action for damages on August 17, 1983. Named as defendants were Dr. Frank Kinberger, Marcus Griffin’s treating pediatrician, Dr. Joseph Brocato, the obstetrician who delivered Marcus Griffin, and SBH, the facility where the treatment was rendered. Drs. Kinberger and Brocato were ultimately dismissed with prejudice on September 17, 1987, and, the only remaining defendant is SBH.
Plaintiffs alleged that the negligent administration of oxygen at the time of Marcus’ birth caused retrolental fibroplasia (RLF) in his left eye, resulting in total blindness in that eye. He also developed glaucoma in his left eye, a myopic right eye, and cataracts and retinopathy prematurity (ROP) in the right eye.[1] Specifically, plaintiffs claim that this excess, unnecessary and unmonitored oxygen therapy was administered, without the use of an oxygen analyzer, by an untrained and unsupervised nursing staff in violation of the long established, well recognized and adopted professional standards. Plaintiffs also contend that SBH was negligent by permitting pediatricians, including Dr. Kinber-ger, to administer oxygen in a substandard manner, in accordance with substandard policies and practices of the hospital.
*1272 At trial, Dr. David Newsome, plaintiffs treating ophthalmologist, testified that Marcus has ROP in both eyes. In his left eye, which is classified as RLF, he is “stone blind” with a “shrunken eyeball”. There is no light or depth perception in the left eye, and this condition is permanent and untreatable. Mr. Griffin also has glaucoma in his left eye which is being treated with eyedrops to alleviate the pressure. With regard to the right eye, Marcus Griffin is severely myopic. His best vision in that eye is 20/60 corrected. Mr. Griffin |3also has cataracts in his right eye, which, while looking at a headlight from an oncoming car, causes glare and halos.
According to Dr. Newsome’s testimony, ROP occurs in low birth weight, premature infants, who have been administered high levels of oxygen for an extended period of time; oxygen disturbs the normal development of the immature blood vessels supplying the retina. Specifically, he noted that it’s the administration of high oxygen concentrations to a premature infant that sparks the “cascade of events” that leads to the development of ROP.
If the administration of this oxygen is stopped or reduced in time, the blood vessels can relax and resume normal growth. However, if the oxygen is continued beyond need, the vessels never grow normally and there is complete scarring thereby causing a loss of sight. Very few cases have been reported claiming that full-term and/or non-low birth babies developed ROP.
Based on the fact that Marcus Griffin was born prematurely weighing two pounds 13 ounces, or 1,276 grams, and received continuous oxygen for at least 17 days, Dr. New-some felt that the supplemental oxygen played a role in initiating the events that led to the development of the various stages of ROP.
Dr. Dale Phelps,[2] neonatologist, testified that ROP occurs “exclusively” in premature babies. Due to the lack of development of the blood vessels to the retina when they are born, these preemies are more susceptible to developing ROP. Most often it is believed that the cause of ROP is prolonged administration of high oxygen. Dr. Phelps noted that there was a specific need for supplemental oxygen on the 5th, 6th, 8th and 11th day of Marcus’ care.[3] |4She opined that, according to reasonable medical certainty, the unnecessary oxygen administered to Marcus caused his ROP. Furthermore, she noted that had the proper standard of care been administered, Marcus most likely would have better vision today. In 1964, the standards required that the amount of oxygen in the incubator should be measured with an analyzer.
In addition to being a premature baby weighing only two pounds 13 ounces, Marcus had several other complications. He was jaundiced and had developed hyperbilirubine-mia, which required an exchange transfusion (blood transfusion) on November 18th. Additionally, he sustained a collapsed lung, several episodes of cyanosis (blueness), and dyspnea (shortness of breath).
Prior to November 30th, the oxygen was continuous, then, on that day, there is a notation of “PRN” on the baby’s chart which means that the nurses were to give oxygen as they determined the baby needed it. The duration of oxygen was ordered by Dr. Kin-berger who actually observed the baby’s condition each day.
By 1964 standards, the ordering of oxygen was something that rested within the sound clinical judgment of the physician. At this time, SBH was accredited by the Joint Commission of Accredited Hospitals (JCAH).
Dr. Isadore Yager, pulmonist, served as chief of oxygen therapy at Touro Infirmary *1273 from 1955 to 1969. According to his testimony, he first learned that there might be a danger to premature babies who were getting oxygen therapy in 1956, and in 1959 his department instituted a program limiting oxygen concentration to 40%. From that point on an oxygen analyzer was used to measure the percentage of oxygen in the incubator. At that time, oxygen ^flowed through tubes to get into the incubator. A liter flow gauge was used to tell how many liters were going into the incubator. However, the gauge did not determine what concentration of oxygen was inside the incubator. The liter flow gauge merely gave a rough index to the concentration of oxygen inside the incubator but did not account for oxygen leakage, flow gauge errors, or kinked tubing. It was the recommendation of Touro’s oxygen therapy department, and the policy of the hospital, not to give over 40% and to reduce it when the baby did not need that much. Dr. Yager specifically recalled that Touro had an oxygen analyzer in use as early as 1959. The standard was that after the nurse or other personnel measured the percentage of oxygen every four hours, the level would be recorded on the patient’s chart.
Lastly, Dr. Yager testified that he would defer to the pediatrician in determining whether a premature infant needed oxygen.
Dr. David Charles Abramson, plaintiffs expert in pediatrics and neonatology, testified that in the early 1950’s, it was being suggested by many researchers that oxygen may play a part in the development of RLF. A study conducted at Charity Hospital at this time revealed that RLF was probably, at least in part, related to high concentrations of oxygen, and that babies should not be given high concentrations. This study was known as the Kinsey Collaborative Study[4] and it revealed that babies could not be left in oxygen any longer than absolutely needed because the duration of oxygen therapy had a clear effect in promoting blindness.
The American Association of Pediatries (AAP) standards published in 1957 revealed that it’s not the oxygen that the babies need that causes blindness, but rather, it is the oxygen in excess of a baby’s need, or the overuse |eof oxygen, that causes blindness. The standards dictated that the hospital measure the oxygen concentration in the incubator with a unit that is known as an oximeter[5] or an oxygen analyzer.
Dr. Abramson testified that Marcus Griffin was a “good premie”, and, therefore, his oxygen administration could have been turned off after the first day. Periodically, he may have needed a few whiffs of oxygen, but Marcus certainly did not need continuous oxygen. Dr. Abramson opined that it’s absolutely impossible for anyone to justify the continuous use of oxygen for a baby like Marcus Griffin during that period of time he received it at SBH. That practice was totally substandard for 1964. He further opined that a nurse must refuse to follow such an order.[6]
The AAP standards between 1954-1964 required a physician with special knowledge and interest in the nurseries to be appointed chief or physician in charge of the nurseries. There were written policies and procedures for nurses to give oxygen administration in accordance with these standards. For example, the charting of oxygen concentration as measured by an analyzer was required every eight hours.
Dr. Abramson felt that SBH committed the following violations in its treatment of Marcus Griffin: there was no demonstrated need for the oxygen most of the time it was given to the baby; the oxygen was given in *1274 unknown concentrations, not measured; and that the administration of oxygen was given 17far longer than any known standard. He believed to a reasonable degree of medical certainty that it was the administration of oxygen in excess of need that caused plaintiff to develop ROP, resulting in blindness. In his opinion, it was SBH’s negligence (failure to be able to meet the requisite standards for 1964, namely, being able to manage oxygen need safely) that caused Marcus Griffin’s blindness.
The standard for both doctors and nurses in 1964 was that oxygen should be given only for a specific indication, in the smallest amount needed to relieve that indication, and only for as short a duration of time as that need persists. In Dr. Abramson’s opinion, both SBH and Dr. Kinberger deviated from the appropriate standards prevailing in 1964.
Dr. Abramson noted that Marcus Griffin’s body temperature was kept very cold. The maintenance of a normal temperature in a premature baby is very important, because if the baby is too cold, he may need more oxygen, which is toxic, and could cause eye injury.
During Marcus Griffin’s tenure at SBH, he was cared for by three nurses. Nurse Ann-ice Matthews testified that SBH did not have oxygen analyzers in 1964. The incubators had oxygen gauges on them which were set at 40%. However, because the nurses were instructed to open the vents on the incubator, a baby did not always get 40% oxygen. Furthermore, in order to get to a baby in the incubator, the top of the incubator had to be lifted open.
Nurse Matthews further testified that if a doctor ordered oxygen and did not mark down a percentage in the chart, it was understood by all on the staff that the concentration given would not be greater than 40%. If it appeared that the baby did not need any oxygen, the doctor would be called to see if the administration of oxygen could be discontinued.
IsGladys Walker Shirley, the head nurse in the nursery in 1964, testified that the gauge on the outside of the incubators was set at 40% and, no tests were conducted to determine what concentration of oxygen was inside the incubator. She reiterated Nurse Matthews’ testimony that when a doctor failed to stipulate more than 40% oxygen in a patient’s chart, 40% concentration was used. In her opinion, a premature baby that had the same problems as Marcus would have gotten oxygen as long as he did. That was the acceptable medical practice.
Lastly, Nurse Shirley testified that she was fairly sure SBH did not have analyzers when Marcus was born because when SBH acquired them, the specific percentage measurements being administered were charted in a patient’s chart.
Nurse Lorella Renshaw, testifying for the defense, stated that she recalled using oxygen analyzers at SBH but did not remember when she started using them. She explained that after analyzers were put into use, the specific percentage was chartered in the record; however, no such percentages were charted in Marcus Griffin’s record.
Nurse Renshaw charted in Marcus Griffin’s chart that he had a hard delivery, his condition was poor, and he was placed in oxygen. At that time, it was routine to administer 40% oxygen unless the baby was still cyanotic. If the blueness continued, a call was placed to the doctor to see if the baby could receive a higher oxygen concentration. As a general rule, 40% was considered sufficient. If greater than 40% was administered, the amount would be charted.
The evidence adduced at trial revealed that Marcus Griffin was maintained in an Isolette incubator. An Isolette incubator, which is manufactured by Air Shields, Inc., is distinguishable from the lift-top type of Incubator manufactured by Gordon Armstrong, in that it affords the nurse or physician to reach, touch and care for the baby through armholes in the side of the unit, thereby avoiding the lifting of the top and losing the oxygen concentration and temperature control.
Ursula Elliott, Air Shields, Inc.’s duly authorized representative, testified that Air Shields had incubators known as Isolettes on the market from 1947 through 1981. The Model C-35, manufactured from 1947 to 1958, did not have an oxygen limiter valve. *1275 The Model C-77, manufactured from 1958-1963, contained an oxygen limiter, as did the Model C-86, manufactured from 1963-1981, which also had a red-flag reminder for concentrations over 40%. Although none of these models came equipped with an oxygen analyzer or any measuring device to determine the concentration of oxygen inside the unit, the instruction manuals for each of these units specifically recommended that analyzers be used to measure the percentage of oxygen inside the incubator.
Dr. William Hyman, Ph.D., head of the Bioengineering Department at Texas A & M, testified that he has been involved in the study of the design of incubators and its relationship to RLF since 1977. He introduced numerous standards, brochures and documents showing manufacturer’s recommendations and specifications for oxygen administration in the 1950’s and 1960’s.
Dr. Hyman testified that all manufacturers of incubators, including Air Shields and Gordon Armstrong, and suppliers of oxygen, such as the Linde Corporation, as well as all standards, recommended that oxygen inside incubators be measured with an analyzer. According to the standards in 1958, oxygen concentration must be determined by means of an oxygen analyzer every four hours. These standards were essentially the same as the AAP’s 1964 standards.
liftAH of the manuals and literature recommend that the hospital should not rely solely on the oxygen limiter valve and the liter flow gauge on the outside of the incubator unit to determine the level of the oxygen on the inside. Dr. Hyman explained that a flow meter measures flow rate of pure oxygen in liters per minute going inside the unit. The oxygen is not measured in actual percentages, but a range of estimated percentages based on the amount of liters that are given. An operator still must measure inside the incubator with an analyzer to see what percentage was actually achieved. Dr. Hyman has personally tested Isolettes and found that they can achieve concentrations greater than 40% even with the amount of liters that supposedly correspond to 40% and with the 40% limiter valve. This same finding had been reported publicly by Air Shields.
Several causes for these false liter flow readings are noted: a dirty or clogged filter which can block the amount of diluting air coming from the outside, thereby creating an imbalance with the pure oxygen being supplied through the wall or tank source; changes in the source pressure can make the flow meter inaccurate; change in the speed of the fan or motor problems can cause change in the relationship of the liter flow and percentages; a flow meter is not designed to detect impurities or deficiencies in the oxygen source; and flow meters are not highly accurate devices. These deficiencies and inaccuracies can be overcome by measuring the air on the inside with an analyzer.
The defendant presented four expert witnesses, Drs. Brown C. Mason, William L. Gill, Keith Morgan, and Thomas Garvey, all of whom have been associated with SBH.
Dr. Brown C. Mason, pediatrician, received his medical degree in 1951 and began private practice in 1954. He had staff privileges at various hospitals | uin the New Orleans area, including SBH. Dr. Mason testified that SBH acquired an Isolette in 1954 and continued carrying them through 1965. In his opinion, SBH was never behind the other hospitals in acquiring equipment. Back in 1964 and 1965, SBH and Ochsner Foundation Hospital had the most current equipment available.
Dr. Mason testified that between 1964 and 1965, 40% or less oxygen level was considered reasonable and safe. In reading Marcus Griffin’s chart, Dr. Mason opined the care Marcus received at SBH was standard for 1964. Although Dr. Kinberger’s order for oxygen did not indicate what percentage of oxygen the patient was to receive, it was understood at that time that a baby must be kept under 40% oxygen unless there was a problem.
Multiple references to oxygen appears in the nurse’s notes; however, there is no percentage specified. According to Dr. Mason, this notation would mean less than 40% concentration was being administered. Back in 1964-65, it was standard procedure for a nurse to simply document oxygen in the *1276 chart without the percentage provided the baby was not receiving more than 40%.
According to Dr. Mason’s testimony, it was routine to put a premature baby weighing two pounds thirteen ounces, that looked perfectly fine at birth, in oxygen for 24-72 hours for fear that he might crash or sicken suddenly. As long as the baby was receiving under 40% oxygen, he would be perfectly safe. An analyzer was used to measure the percentage of oxygen on the inside of the incubator. Even though Dr. Mason personally did not like analyzers, they were used by the nurses on every shift.
Dr. Mason further testified that back in 1964^65, SBH had a chairman of the department of pediatrics. He would have been a private physician who had staff privileges— this was common practice at other hospitals. | Additionally, Dr. Mason noted that in 1964, SBH had an oxygen therapy department, but he did not recall who ran it.
During Dr. Mason’s tenure at SBH, it was accredited by the Joint Commission of Accredited Hospitals. Dr. Mason concluded that Marcus Griffin’s prematurity caused his ROP. 40% oxygen was considered safe by the pediatric community in New Orleans in 1964 and he had no reason to believe Marcus received inappropriate care at SBH.
Dr. William L. Gill, neonatologist, opined that plaintiffs chart reflects that the care provided to Marcus was within the standards and approaches taught in 1964, that oxygen at a level of 40% or less was considered safe. This 40% safe rule was applied in California as well as New Orleans. Dr. Gill stated that he learned of the 40% rule while at Touro.
Dr. Gill testified that the treatment and care delivered at SBH in 1964 met the standards of the AAP. If oxygen was being administered at 40% or less, there was no requirement to document what percentage was actually being used because it was considered safe. Despite the technology that exists today to monitor oxygen exposure at all levels, there are still babies who sustain damage to their eyes, particularly the group of very immature babies.
Dr. Keith Morgan, specialist in pediatric ophthalmology, received his medical degree in 1973. He testified that other than prematurity, it’s very unclear as to what causes itOR According to the most current information available, a baby born at plaintiff’s birth weight has a two-thirds probability that be will develop some degree of ROP.
Dr. Thomas Garvey, pediatrician, was practicing pediatrics in New Orleans in 1964; he had staff privileges at SBH at this time, After reviewing Marcus’ chart, he opined that SBH had complied with the standard of care in 1964. At this time, it was believed that 40% oxygen was safe — this was the | ^standard at every hospital in the eommunity. If the percentage of oxygen administered remained at 40% or less, there was no need to chart it; however, anything above 40% had to be charted — that was the practice at all hospitals. Oximeters were used to determine percentages.
Dr. Garvey specifically recalls that SBH had analyzers in 1964. He attributes his memory to the birth and death of President Kennedy’s premature baby in 1963 even with state-of-the-art equipment. At that time SBH had analyzers.
Dr. Garvey further testified that if he had a choice as to where he would want to treat a sick premature baby, SBH would be the place. He further stated that the nursing care provided at SBH was consistent with 1964 standards.
Following a jury trial, judgment was rendered in favor óf SBH. Plaintiffs moved for a judgment notwithstanding the verdict and for a new trial, both of which were denied. This appeal followed.
DISCUSSION

ASSIGNMENT OF ERROR NO. 1

In this assignment of error, the plaintiffs maintain that the trial court failed to properly instruct the jury as to a hospital’s duty with regard to caring for a patient. In particular, plaintiffs argue that the trial court failed to instruct the jury as to a hospital’s duty with regard to the granting of staff privileges to physicians. At the conclusion of the evidence, plaintiffs submitted three jury charges pertaining to these areas. However, *1277 the trial judge refused the second paragraph of plaintiffs’ requested Jury Charge No. 1 and all of plaintiffs’ Jury Charge Nos. 2 and 3. Those charges provided as follows:
JuPLAINTIFFS’ JURY CHARGE NO. 1 (second paragraph)
Similarly, the law imposes upon a hospital a direct duty to the patient in connection with his treatment, and consequently holds the hospital liable for its own negligence, even if there is or there is not any negligence on the part of a physician. Sibley v. Board of Supervisors of LSU, 490 So.2d 307, 313 (La.App. 1st Cir.1986).
PLAINTIFFS’ JURY CHARGE NO. 2
As examples of the independent duty owed by a hospital to its patients, I instruct you as follows.
A hospital owes a duty to select its employees and nurses with reasonable care. This duty also extends to granting staff privileges to physicians. A hospital has the control over who the hospital permits to have staff privileges and practice medicine and treat patients within the hospital. By the hospital’s authority to grant and invoke staff privileges, a hospital exercises a certain degree of control over the quality of medical care provided. For that reason, a hospital which grants staff privileges to a physician or physicians who are incompetent or who routinely violate the appropriate standards of care, that hospital would be directly liable to a patient damaged by that physician’s incompetence or failure to follow the standard of care. As I will instruct you in more detail, you may consider any standards published by the American Association of Pediatries and the American Hospital Association and the Joint Commission on Accreditation of Hospitals, as well as testimony by expert witnesses, as to what the appropriate standard of care was at the times and under the circumstances pertinent to this case. Also, a hospital has a duty to be furnished and equipped with reasonably adequate supplies, equipment, appliances and facilities for use and the diagnosis and treatment of patients.
If you find that the standards of care as provided by the American Association of Pediatries, American Hospital Association and the Joint Commission on Accreditation of Hospitals, as well as testimony by expert witnesses, require monitoring of medical treatment of a patient such as Marcus Griffin, then the hospital also has a duty to review and monitor medical treatment. When such a duty to monitor and review is appropriate, the hospital staff, including staff physicians and nurses, have a duty to see to it that the | ^appropriate standards of care are being followed by the private physician and to make any corrections or raise questions with supervisors and other personnel when such standards are not being followed.
A breach of any one of these duties or a similar duty of care which causes injury to a patient may constitute independent negligence by a hospital resulting in the hospital’s liability, whether or not there was also negligence on the part of a private physician. [Sibley v. Board of Supervisors of LSU, 477 So.2d 1094, 1099 (La.1985), on remand, 490 So.2d 307, 313-14 (La.App. 1st Cir.1986) ]
PLAINTIFFS’ JURY CHARGE NO. 3
As I have instructed you, “a hospital has an independent obligation and duty of care to its patient which is independent of any obligation or duty owed by a treating physician.” Bossier v. DeSoto General Hospital, 442 So.2d 485, 490 [La.App. 2nd Cir.1983], citing Hunting v. Bogalusa Community Medical Center, 303 So.2d 745, 747 [La.1974].) This being so, the hospital is not protected from responsibility and liability solely by the fact that its nurses and staff may have strictly followed the orders of a private physician. Even if you believe that the nurses were strictly following doctor’s orders, the patient is still “entitled to rely upon the hospital’s expertise and independent professional judgment to supplement the treating physician’s direct orders when necessary to afford the patient the safe and reasonable health care the hospital is obligated to provide. Therefore, assuming the hospital strictly followed the treating physician’s order in this case [re *1278 garding continuous oxygen therapy], strict adherence to the physician’s orders cannot excuse the failure to provide safe and reasonable care to the patient, nor preclude a finding of negligence on the part of the hospital.” (Id.). Similarly, if the nursing staff or other personnel of the hospital knew or should have known that the doctor’s orders were not in accordance with the appropriate standard of care, and make no inquiry or report the inappropriate order or treatment to the physician, himself, or to a supervisor or other doctor or personnel at the hospital, the hospital is liable and responsible for any damages that may result from the hospital’s following the physician’s erroneous orders. [Bossier v. DeSoto General Hospital, 442 So.2d 485, 490 (La.App. 2nd Cir.1983); Poor Sisters of St. Francis v. Catron, 435 N.E.2d 305, 308 (Ind.App.1982); Smith, Hospital Liability, Supplement 1987, Law Jour. Seminars Press, Sections 11.04(1), (2).]
116Plaintiffs contend that SBH was negligent in granting Dr. Kinberger staff privileges and that the trial judge should have specifically charged the jury with this theory of recovery. In support of their proposition, plaintiffs cite Sibley v. Board of Supervisors of LSU, 477 So.2d 1094, 1099 (La.1985), on remand, 490 So.2d 307, 313-14 (La.App. 1st Cir.1986) which instructs that a hospital may be responsible for granting staff privileges to physicians, who are incompetent and practice in a routinely substandard manner and for permitting physicians to practice in the hospital in a substandard manner. Plaintiffs also cite Bossier v. DeSoto General Hospital, 442 So.2d 485, 490 (La.App. 2d Cir.1983), writ denied, 443 So.2d 1122 (La.1984) which states that a hospital owes “an independent obligation and duty of care to its patient which is independent of any obligation or duty owed by the treating physician.” This independent duty is not absolved simply because the nurse or other personnel may have strictly followed the orders of a physician with staff privileges. Without these proper instructions, plaintiffs contend the jury could not have found for Marcus Griffin.
(1,2] It is well established that adequate jury instructions are those which fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. In making his charges to a jury, a trial judge is not required to give the precise instructions submitted by either party but must give instructions which properly reflect the law applicable in light of the facts of the particular case. Barnett v. New Orleans Public Service, Inc., 489 So.2d 452, 455 (La.App. 4th Cir.1986) (citing Cuccia v. Cabrejo, 429 So.2d 232, 235 (La.App. 5th Cir.), writ denied, 434 So.2d 1097 (La.1983)).
The adequacy of the jury instructions given by the trial court must be determined in the light of the instructions as a whole. Brown v. White, 405 So.2d 555, 558 (La.App. 4th Cir.1981), aff'd, 430 So.2d 16 (La.1982). | ^Furthermore, the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and the facts. Id. Thus, an appellate court is not automatically justified in conducting a trial de novo by the mere discovery of an error in the judge’s instructions; the appellate court must first measure the gravity or degree of the error and consider the instructions as a whole, as well as the circumstances of the ease. Id. See also, Jones v. Liberty Mutual Insurance Co., 568 So.2d 1091 (La.App. 5th Cir.1990), writ denied 572 So.2d 72 (La.1991).
The trial court gave the following general instruction on a hospital’s duty to its patients:
In general, a hospital is bound to exercise the requisite amount of care toward a patient that the particular patient’s condition may require. It is the hospital’s duty to protect a patient from dangers that may result from the patient’s physical and mental incapacities as well as from external circumstances peculiarly within the hospital’s control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that ease, [citing Hunt v. Bogalusa Communi *1279 ty Medical Center, 303 So.2d 745, 747 (La.1974) ].
The hospital has the duty to provide and maintain adequate facilities and supplies and a competent staff so as to provide competent care to its patients. However, hospitals are not insurers of their patients, [citing Sibley v. Board of Supervisors of LSU, 490 So.2d 307, 311 (La.App. 1st Cir.1986) ].
The trial court determined that the above charge sufficiently covered plaintiffs’ theory of negligence against SBH. To support its position that the trial judge should have included the requested charges, plaintiffs note that the jurors raised several questions regarding SBH’s potential liability for Dr. Kinberger’s acts. Specifically, questions were raised by the jury as to the relationship of Dr. Kinberger, a physician with staff privileges, and the hospital. LgAfter being re-instructed on the law of negligence, the jury asked for an instruction on “the responsibility of the liability of the hospital for actions of the doctor or of others” and “who’s liable for the action for the doctors, who’s liable for the others, and is the doctor considered an employee of the hospital in terms of liability of the hospital?” The trial court responded by repeating the charge on respondeat superior, restricted to employees and nurses. As described in plaintiffs’ Jury Charge Nos. 2 and 3, and the cases of Sibley, supra, Bossier, supra, and the other authorities cited therein, the trial court gave no instance of when and how a hospital can be responsible for the negligence of a staff doctor.
After further deliberations, the jury again raised questions regarding the potential liability of the hospital for the negligence of Dr. Kinberger. The court answered that “he’s separate and apart” with regard to liability. A juror replied that “we feel uncomfortable with that.” Asked whether Dr. Kinberger was an employee of the hospital, the trial judge responded that he was not. The nurses are the employees of the hospital. “So you-all have to struggle with it”.
Later in the deliberation, the jury' returned with additional questions as to whether Dr. Kinberger is still a defendant, whether his case has been separately settled and similar questions regarding who can still be liable in this case. Plaintiffs contend that not only did the trial judge not give full and adequate instructions to the jury, but he compounded the erroneous instruction by giving an incorrect conclusion of law that “the hospital is not responsible for what the doctor does.” According to Sibley, supra, and Bossier, supra, a hospital can be liable for negligence of a doctor. The trial judge then erroneously explained that the doctor and the hospital should, as a matter of law, be considered two separate entities.
| ^Plaintiffs offered no evidence that SBH’s credentialling procedures for the granting and revocation of staff privileges were in any way deficient or that the hospital failed to follow its own policies and procedures. In fact, no evidence was offered to suggest that Dr. Kinberger should have been denied staff privileges. Dr. Kinberger not only held staff privileges at SBH, but at virtually every other hospital in the New Orleans area.
Under Louisiana law, hospitals are not vicariously liable for the negligence of physicians who hold staff privileges, and it is well settled that hospitals are not insurers against physician malpractice. Sibley v. Board of Supervisors, 490 So.2d at 314.
Although plaintiffs argue that the trial court’s charges concerning a hospital’s duty to its patients were inadequate, we find that the charge given to the jury properly explained a hospital’s duty as set forth by the Louisiana Supreme Court in Hunt v. Bogalu-sa Community Medical Center, 303 So.2d at 747. Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2

The plaintiffs contend SBH breached its duty of care while treating Marcus Griffin.
In 1964, a baby of Griffin’s weight, between 1200-1330 grams, had roughly a four in ten chance of survival, and out of the four that survived, one would develop ROP. In addition to his low birth weight, Griffin was born with a number of life-threatening complications because of his prematurity. In his sixth day, Griffin underwent an exchange transfusion, which completely replaced his *1280 blood with donor blood, because of jaundice which threatened brain damage. Griffin also suffered from a collapsed lung. SBH contends that Griffin’s severe medical problems required him to have continuous 40% concentration of supplemental oxygen administered to help him breathe. In | 2q1964, the American Association of Pediatrics (AAP) stated that oxygen concentration should not be over 40%. A limiting valve controlled the flow of oxygen to the incubator and SBH used an oximeter to regulate the concentration of oxygen. The AAP guidelines further instructed that oxygen therapy should be discontinued as soon as the indication for it had passed, and that the treatment of a premature baby’s symptoms must rest with the clinical judgment of the attending physician. SBH introduced the testimony of three pediatricians practicing in 1964. According to their testimony, SBH did not violate the standard of care because Marcus Griffin’s condition made it necessary to treat him with continuous supplemental oxygen.
Dr. Charles Abramson, plaintiffs’ expert, characterized Griffin as a “good premie”. AAP guidelines state that Griffin should have been given oxygen when he experienced cya-nosis (bluish discoloration of the skin) or dyspnea (difficulty breathing) and only for a limited period of time until he turned pink or could breathe again on his own. Plaintiffs further assert that SBH did not monitor the amount of oxygen Griffin received with an oxygen analyzer. In fact, according to plaintiffs, SBH did not even have an oxygen analyzer in 1964. SBH counters that it did have an oxygen analyzer in 1964 and indeed used one in the treatment of Griffin. SBH argues that it would not have received the accreditation of the Joint Commission of the Accreditation of Hospitals if it were not equipped with an analyzer.
Moreover, plaintiffs claim that the nurses who treated Griffin were not specially trained to care for premature babies requiring oxygen administration. Also, there were no written rules or policies regarding oxygen administration to premature babies. These nurses were not only untrained, but also unsupervised in administering oxygen to premature babies.
121SBH maintains that its nurses were indeed qualified to treat such babies. Further, the nurses remained in constant communication with the pediatricians on staff at SBH. Nurse Renshaw testified that the pediatricians examined each of their patients every day, discussing the baby’s condition with the nursing staff during their daily rounds.
Lastly, SBH contends that prematurity, not oxygen, was the cause of Marcus Griffin’s ROP. SBH’s experts testified that two-thirds of the babies of Griffin’s birth rate would develop ROP, and that even today, let alone in 1964, a baby who weighs 1275 grams at birth is still at a “very great risk” for developing ROP.
SBH’s three experts, Drs. Mason, Guidry, and Gill, who were practicing at the time, testified that under the circumstances, the administration of continuous supplemental oxygen was necessary to keep a baby like Marcus Griffin alive. The AAP Recommendations on Oxygen Use for 1964 notes that “it would be unwise to deny arbitrarily adequate oxygen (and perhaps life) because of possible injury to the eyes of some.” The jury agreed and entered judgment for SBH. We find no manifest error with that decision. Accordingly, this assignment is without merit.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
JONES, J., concurs in the result.
PLOTKIN, J., dissents with written reasons.

. ROP, which used to be called retrolental fibro-plasia, generally occurs in low birth weight, premature babies. There are five stages of this disease: (1) nearsightedness; (2) scarring; (3) glaucoma; (4) cataracts; and (5) total blindness, called retrolental fibroplasia, or RLF.

. Dr. Phelps acquired her medical degree in 1969.

. At the time of Marcus Griffin's birth, his appearance was poor so he was given 30 minutes of oxygen. Marcus had an Apgar score of four on a scale of ten, which meant that he needed help in making the transition from living inside of his mother to the outside. Thirty minutes later his Apgar was an eight. On the sixth day, the baby had an exchange transfusion. He had had difficulty breathing on previous days, turned blue, jaundiced, and body temperature was cold. On the eighth day, the baby was cold to touch, blue, and had difficulties breathing. Finally, on the 11th day, the baby turned blue during feeding.

. The Kinsey study involved administering 50-60% oxygen to premature babies for a period of 30-40 days.

. An oximeter is a tiny device that can be carried from incubator to incubator. A little tube is placed inside the incubator, squeeze the bulb, and the needle will measure the concentration of oxygen that the baby is breathing.

. Regarding staff privileges, Dr. Abramson stated that the accepted standard is that "the hospital has an obligation to exercise some degree of supervision and control over its physicians through granting or revoking of staff privileges.” Dr. Abramson described Dr. Kinberger’s order for oxygen as “an illicit order,” one that cannot be followed in the form that it is given. A proper order in 1964 for oxygen administration should have been for oxygen up to 40% with PRN (as needed) for cyanosis.